No. 90-521

IN THE SUPREME COURT OF THE STATE OF MONTANA

1991

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

BONNY LYNN SPALDING,
a/k/a BONNY L. PEAK,

      Defendant and Appellant.



FILED

FEB 21 1991

*Ed Smith*

CLERK OF SUPREME COURT
STATE OF MONTANA

APPEAL FROM:    District Court of the Fourth Judicial District,
In and for the County of Missoula,
The Honorable Ed McLean, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

      Diana P. Leibinger, Esq., Missoula, Montana

      For Respondent:

      Hon. Marc Racicot, Attorney General, Helena,
      Montana

      Barbara Harris, Deputy Missoula County Attorney,
      Missoula, Montana

Submitted on Briefs:  January 25, 1991

Decided:  February 21, 1991

Filed:

Clerk

Chief Justice J. A. Turnage delivered the Opinion of the Court.

Bonny Lynn Spalding appeals her convictions of accountability for robbery and criminal endangerment following a jury trial in the Fourth Judicial District, Missoula County. We affirm.

Ms. Spalding raises the following issue:

Did the District Court err when it refused to instruct the jury that the defense of compulsion may be found when the defendant acts to protect a third person from harm?

In 1990, Bonny Lynn Spalding lived in Seattle, Washington, with her two-and-a-half-year-old son, Vincent. In February, 1990, Bonny met Dan Orozco. The two began dating and established a relationship. Although Bonny was aware that Dan had a history of violence and had recently been released from prison, Dan never exhibited any violence toward Bonny or Vincent.

A few weeks later, Bonny and Dan decided to leave Seattle together; the couple, along with Vincent, left Seattle by car in March, 1990, and stopped at random locations. Bonny and Dan rode in the front seat of the car while Vincent was strapped in a child car seat in the back seat. Bonny and Dan had little money, and Bonny would often panhandle, go to food banks, or get money from churches to finance their continuing trip.

On the evening of April 5, 1990, the threesome arrived in Missoula, Montana, where they stopped at a Kentucky Fried Chicken restaurant, and parked in its parking lot. Bonny and Dan testified that they stopped at the restaurant so Vincent could use the

2

bathroom. Bonny further testified that at the time the restaurant was getting ready to close, Vincent and she entered the restaurant, Vincent waved and said "hi" to the employees, they used the bathroom, and then left. However, Rhonda Kolar, an employee of the restaurant, testified that a woman and small child never entered the restaurant to use the bathroom during that time period that evening. Instead, Rhonda testified that toward the end of her shift that evening, a car, driven by a man with a woman passenger and a cluttered back seat, came to the drive-up window, ordered food, and left.

Outside of the restaurant was Donna Kolar, who was parked in the restaurant's parking lot waiting for her daughter, Rhonda, to get off of work. Donna testified that she observed a car as it pulled through the restaurant's parking lot and then returned to the parking lot to use the drive-up window. Donna testified that this car then left, returned to the parking lot again, and backed up in a parking space.

When the car stopped, Donna testified that the driver of the car, later determined to be Dan, got out of the car. After Dan urinated behind the car, Donna testified that Dan returned to the car and retrieved a coat, gloves, and what appeared to be a gun; Dan placed the apparent gun on the roof of the car. Donna watched as Dan put on the coat and gloves and placed the apparent gun in the front of his pants. As he did this, Donna testified that it appeared that he was talking to the other adult in the car, later

3

determined to be Bonny. Donna testified that Bonny then slid into the driver's seat of the car. Donna then lost sight of Dan as he walked behind the restaurant.

After a short time, Donna saw Dan run back to the car with a sack or envelope in his hand. Donna testified that he got into the front seat of the car and disappeared from view. As the car pulled away, Donna memorized the car's Washington license plate. Donna then went into the Kentucky Fried Chicken restaurant and telephoned for police assistance.

Richard Berry, an employee of Store 24 gas station and convenience store located near the Kentucky Fried Chicken restaurant, testified that a man, later determined to be Dan, entered this store at approximately 9:00 p.m. that evening. Richard testified that Dan asked him for some Camel cigarettes and then told him to "put the money in the bag." Richard responded, "What?" Richard then testified that Dan opened his jacket to reveal the light-colored handle of a gun. Richard testified that he put the money, including a $50.00 bill into a sack. Dan then picked up the sack and the cigarettes and told Richard to go and remain in a back room of the store for three minutes or else he would "be history." Richard complied, but after waiting three minutes in the back room, he telephoned for police assistance from the store.

Meanwhile, the fleeing car, driven by Bonny, stopped for gasoline at a gas station; Bonny entered the gas station to pay

4

before she pumped gas into the car. Bonny testified that, although she was aware that Dan had either robbed or attempted to rob somebody, she complied with Dan's order to drive the car from the restaurant's parking lot because she did not have enough time at the parking lot to get Vincent out of the back seat and flee from the car. When Bonny went into the gas station to pay for the gas, she testified that she did not attempt to telephone police officers in the gas station because she feared for Vincent's safety, who was then alone in the car with Dan. Dan testified that although he never physically threatened or directly issued a verbal threat to either Bonny or Vincent during their flight, from his actions, Bonny could assume a threat.

When Bonny returned from the gas station, she pumped gas into the car and noticed a police car in the vicinity while she was putting on the gas cap. She then reentered the car and drove to Interstate 90. Police cars, including the one at the gas station, began to pursue the car as it approached and gained access to the interstate. According to a pursuing police officer, while on the interstate, Bonny drove the car close to the shoulder line and maintained a speed of fifty-five to sixty miles an hour as she proceeded east on the interstate as police cars pursued the car with their emergency lights on. The car eventually stopped when a pursuing police car deliberately hit the car on the passenger's side after police officers perceived that the car was going to attempt to outrun the police cars when it accelerated. Bonny and

5

Dan testified that at one point, Bonny had attempted to stop the car on the interstate, but she aborted her attempt after Dan insisted that she continue to evade the police.

The following day, police officers entered the car and found $120.00 in cash under the seat and on the floorboards of the passenger side of the car. The police officers also found a toy pistol with a light-colored grip, a pair of black gloves, and three packs of Camel cigarettes in the car. A $50.00 bill was also found during an inventory search following Dan's arrest.

Dan pled guilty to robbery and is currently imprisoned for this offense. On April 20, 1990, Bonny was charged by information with accountability for robbery and criminal endangerment. Following a jury trial, on June 5, 1990, Bonny was found guilty of both charges. On July 11, 1990, the District Court sentenced Bonny to fifteen years imprisonment for accountability for robbery, and ten years imprisonment for criminal endangerment, these sentences to run consecutively. Bonny was also designated a dangerous offender for parole purposes. From these convictions, Bonny appeals.

Did the District Court err when it refused to instruct the jury that the defense of compulsion may be found when the defendant acts to protect a third person from harm?

Section 45-2-212, MCA, provides:

6

> **Compulsion.** A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he [or she] performs under the compulsion of threat or menace of the imminent infliction of death or serious bodily harm if he [or she] reasonably believes that death or serious bodily harm will be inflicted upon him [or her] if he [or she] does not perform such conduct.

Here, the District Court used the following language to instruct the jury on the compulsion defense:

> It is a defense to the charge made against the defendant that she acted under the compulsion of threat or menace of the imminent infliction of death or serious bodily harm, if she reasonably believed death or serious bodily harm would be inflicted upon her if she did not perform the conduct with which she is charged.
>
> The defense of compulsion is an affirmative defense and the defendant has the burden of proving each element of the defense by a preponderance of the evidence.

The District Court refused to instruct the jury on the compulsion defense using the following language:

> It is a defense to the charge made against the [d]efendant that she acted under the compulsion of threat or menace of the imminent infliction of death or serious bodily harm, if she reasonably believed death or serious bodily harm would be inflicted upon her <u>or her child</u> if she did not perform the conduct with which she is charged.
>
> The defense of compulsion is an affirmative defense and the [d]efendant has the burden of proving each element of the defense by a preponderance of the evidence. The State has the burden of proving beyond a reasonable doubt there was no compulsion.

(Emphasis added.)

7

Bonny argues that the District Court erred when it refused to include the language "or her child" in the jury instruction regarding the defense of compulsion. Bonny argues that she was compelled to drive the get-away car after Dan committed the robbery because she believed Dan would inflict imminent serious bodily harm upon her son, Vincent, if she did not comply. Bonny's argument lacks merit.

The language of the applicable statute, in this instance, § 45-2-212, MCA, is a proper guide for instructing the jury. See State v. Coleman (1978), 177 Mont. 1, 31, 579 P.2d 732, 750; State v. Bingman (1987), 229 Mont. 101, 112, 745 P.2d 342, 348-49. Here, § 45-2-212, MCA, does not provide that the compulsion defense includes imminent threats of harm to a third person. A court's function is not to add to a statute; rather, a court is "to ascertain and declare what is in terms or in substance contained [in the statute], and not to insert what has been omitted. . . ." Section 1-2-101, MCA. Therefore, the District Court properly instructed the jury on the compulsion defense by following, and not adding to, the statutory language of § 45-2-212, MCA.

Affirmed.

_____
Chief Justice

8

We concur:

_John Conway Harrison_

_Terry Trieweiler_

_William E. Hunt Sr._

_____
Justices